Filed 4/28/26  P. v. Gist CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085079 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD303415) |
| v. | |
| PRESTON GIST, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Evan P. Kirvin, Judge.  Affirmed in part, reversed in part with instructions.

Kristin M. Ault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, A. Natasha Cortina and Michael J. Patty, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Preston Gist of (1) selling a controlled substance (fentanyl) (Health & Saf. Code, § 11352, subdivision (a),[1] count 1); and (2) possessing fentanyl for sale (*id.*, § 11351, count 2).  Gist admitted he had two prior strikes (Pen. Code,[2] §§ 667, subds. (b)–(i) & 1170.12) and had served a prior state prison term (Cal. Rules of Court,[3] rule 4.421(b)(3)).  The trial court sentenced Gist to the low term of three years on count 1, doubled due to the strike priors; and the low term of two years on count 2, with punishment stayed.  (§ 654, subd. (a).)  The court also imposed a restitution fine of $600 (§ 1202.4, subd. (b)(1)), a matching parole revocation fine (§ 1202.45, subd. (a)), which it stayed, and other fines, fees, and assessments.

On appeal, Gist contends (1) we must reverse his conviction on count 1 because the white powdery substance he sold was never tested and found to be a "controlled substance" (Health & Saf. Code, § 11352, subd. (a)); (2) the cause must be remanded for resentencing because the trial court should have applied the mitigating factors applicable to "an enhancement" in section 1385, subdivision (c) when it considered whether to dismiss his two prior strikes; and (3) the court erred in imposing the restitution fine and other fees

---

[1]     In their respondent's brief, the People incorrectly refer to the charge in count 1 as a violation of Health and Safety Code section 11452, subdivision (1).  The Second Amended Information filed on July 24, 2024, states that Gist was charged in count 1 as follows:  "[Gist] did unlawfully sell, furnish, administer, and give away, and offered to sell, furnish, administer, and give away controlled substances, to wit: fentanyl, in violation of Health and Safety Code Section 11352(a)."  (Capitalization omitted.)

[2]     All undesignated statutory references are to the Penal Code.

[3]     All further "rule" references are to the California Rules of Court.

and assessments without first determining whether he had the ability to pay them.

As we explain, we conclude (1) substantial evidence supports Gist's conviction on count 1 for the sale of a controlled substance; (2) the trial court did not err in declining to apply section 1385, subdivision (c) when it refused to dismiss his strike priors; and (3) remand is necessary for the limited purpose of allowing the trial court to conduct a hearing on whether Gist has an ability to pay the various fines, fees, and assessments it imposed, in accordance with this opinion and the Supreme Court's recent decision in *People v. Kopp* (2025) 19 Cal.5th 1 (*Kopp*).  In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[4]

Veteran San Diego Police Officer Ethan Wittlieff was working as a member of the crime suppression team on the evening of May 8, 2024, in an area of downtown San Diego known for street sales of narcotics.  While parked in his marked patrol car, he observed (through binoculars) Gist, sitting on the sidewalk about 75 yards away.  Officer Wittlieff saw a female holding a "strip of aluminum foil" approach Gist, then "abruptly stop[ ]" when she looked in the officer's direction.  Based on his training and experience, Officer Wittlieff suspected Gist was engaged in narcotic activity, and requested that an officer in plain clothes and in an unmarked car join the

---

[4]     Because Gist challenges the sufficiency of the evidence as to count 1, we summarize that evidence in the light most favorable to the judgment.  (See *People v. Reyes* (2023) 14 Cal.5th 981, 988.)

3

surveillance in an undercover capacity.  Officer Wittlieff then left and parked nearby.

San Diego Police Detective Jordan Vina was assisting the crime suppression team on the evening of May 8.  Wearing street clothes, he parked his unmarked car, with tinted windows, about 15 yards away from Gist.  Gist was sitting on the ground with his legs crossed and "manipulating or focused on something . . . between his legs."

As he continued his surveillance, Detective Vina saw an unidentified individual walk up to Gist and his female companion.  The individual was holding "something" in his hand and appeared ready to give it to Gist or the female.  The individual, however, "immediately" left the area without exchanging anything, after the female said something to him.  For the next several minutes, Detective Vina saw a "bunch of people" walking up to Gist.

As he continued the surveillance, Detective Vina saw a Hispanic male, later identified as Emmanuel L., stop in front of Gist, crouch down, and Gist extend his hand and in a "handshake" exchange "something" with Emannuel.  As Emmanuel walked away, Detective Vina saw he had something "clenched" in his right hand.  A few seconds later, Emmanuel put that hand in his right pants pocket and moments later when he removed it, his hand was empty.  Detective Vina notified the crime suppression team of the "hand-to-hand transaction" he had just witnessed.  Other members of the suppression team detained Emmanuel shortly thereafter, about three blocks away.

Officer Wittlieff placed Emmanul under arrest "for loitering for drug activity." The officer then conducted a search incident to arrest and found a "folded white piece of paper" with a "white powdery substance" in Emmanuel's right pocket. Based on his training and experience, Officer Wittlieff believed the white powder was fentanyl. He next placed Emmanuel in the back seat of his patrol car, drove back to Gist's location, and arrested Gist. At some point, Officer Wittlieff' activated his body-worn camera and the video from it was played for the jury.

Near where Gist had been sitting, Officer Wittlieff found (1) a "green folding knife" "covered with a white powdery residue," which the officer opined was used to "cut product" into "individual serving sizes"; (2) a circular mirror that contained the same powdery substance, which he opined was used as a "surface for serving narcotics"; (3) "folded foil" on the circular mirror, which contained the same substance; (4) additional foil in Gist's black sweatshirt, which he opined was a "common packaging material" for narcotics sales; and (5) a "circular rubber container" under a mat where Gist had been sitting, which contained a substance that appeared to "match[ ] the white powdery substance recovered from [Emannuel]."

Officer Wittlieff next searched Gist's belongings and person. Inside Gist's fanny pack, Officer Wittlieff found $27 and two "foils" containing a small amount of the white powdery substance. In Gist's left pocket, the officer found $66. The money was in mixed denominations, which he opined was indicative of drug sales, as dealers selling narcotics on the street receive "any kind of bills . . . to pay for the drugs."

5

Officer Wittlief also conducted a lawful search of Gist's cellphone and found two older text messages indicative of drug sales, including one in which Gist and his "contact" appeared to be "discussing pricing for drugs in the downtown area" of San Diego.

Officer Wittlieff interviewed Gist at the police station. The interview was played for the jury, and a copy of the transcript of the interview is included in the record. During the interview, Gist admitted possessing "[o]ne gram" of "fentanyl" and selling $5, or "[s]omething like that." When asked who he sold it to, Gist replied, "I don't even know the [f***ing] kid's name." A laboratory test confirmed the white powdery substance in the rubber container contained fentanyl and weighed 1.32 grams.

At the conclusion of the evidence, Gist made an oral motion to dismiss count 1 under section 1118.1,[5] arguing there was no evidence the untested substance recovered from Emannuel was a "controlled substance." The court summarily denied the motion, finding sufficient evidence, including the reasonable inferences to be drawn from such evidence, to support a conviction on count 1 and, "for that matter," on count 2. As noted, the jury convicted Gist on both counts; he has not challenged his conviction on count 2.

---

[5] Section 1118.1 provides in part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

DISCUSSION

I.

*Substantial Evidence Supports Gist's Conviction on Count 1*

Gist contends we must reverse his conviction on count 1 because there is no substantial evidence he sold Emmanuel a "controlled substance." We disagree.

A.  *Governing Law*

To convict Gist on count 1, the People were required to prove (1) he "sold a controlled substance"; (2) he "knew of its presence"; (3) he "knew of the substance's nature or character as a controlled substance"; and (4) the "controlled substance" was fentanyl. (CALCRIM No. 2300, as modified.) The court also instructed that "[s]*elling* . . . means exchanging a controlled substance for money, services, or anything of value"; and that "[t]he People do not need to prove that the defendant knew which specific controlled substance he sold."

"When reviewing a challenge to the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for substantial evidence—that is, evidence which is reasonable, credible, and of solid value that would support a finding beyond a reasonable doubt. In doing so, we view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence. We must also accept logical inferences that the jury might have drawn from the circumstantial

7

evidence. We do not question the credibility of a witness's testimony, so long as it is not inherently improbable, nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302 (*Navarro*) [cleaned up].)

B.    *Substantial Evidence Supports the Finding Gist Sold Fentanyl*

As noted, Gist admitted at the police station that he possessed about one gram of fentanyl; sold $5, or "[s]omething like that," to a "kid" on the day of his arrest; and a test confirmed the white powdery substance in the rubber container was fentanyl.

In addition, Detective Vina, while conducting undercover surveillance about 15 yard away from Gist, saw Emmanuel and Gist exchange "something" in a "hand-to-hand transaction"; and, as Emmanuel walked away, saw he was "clench[ing]" something in his right hand that he immediately put in his right pocket. Just a few minutes later, officers detained Emmanuel about three blocks away and found a folded piece of paper containing a white powdery substance in his pocket.

In addition, during a search incident to arrest, Officer Wittlief found money in various denominations both in Gist's fanny pack and on his person, as well as more foil strips in his black sweatshirt. The officer also found foil packets in Gist's fanny pack containing small amounts of the white powdery substance that matched the appearance of the substance found in the rubber container that tested positive for fentanyl, as well as the substance on Emmanuel. Moreover, at the time of his arrest, Gist was in an area of downtown San Diego known as a "high narcotic area" for street sales, where both Officer Wittlief and Detective Vina were working as part of the crime suppression team. Based on the appearance and packaging of the white powdery substance found on Emmanuel, when viewed in light of all the other

8

circumstances including Gist's post-arrest admissions and the positive test for fentanyl, Officer Wittlief opined that Gist sold Emmanuel a controlled substance.

"It is well settled that . . . experienced officers may give their opinion that the narcotics are held for purposes of sale based upon such matters as quantity, packaging and normal use of an individual; on the basis of such testimony convictions of possession for purpose of sale have been upheld." (*People v. Parra* (1999) 70 Cal.App.4th 222, 227 [cleaned up].) Both Detective Vina and Officer Wittlief had extensive training and experience in narcotic sales. Officer Wittlief in particular had made more than 200 arrests and "[e]asily" had observed fentanyl over 100 times, which, he noted, had a different look and—when sold on the street—was packaged differently than methamphetamine or crack cocaine.

We conclude from this evidence that a rational trier of fact could have found Gist "sold" fentanyl to Emmanuel for purposes of CALCRIM No. 2300. (See Health & Saf. Code, § 11352, subd. (a); *Navarro, supra*, 12 Cal.5th at p. 302.) This same evidence also establishes the other elements of CALCRIM No. 2300, which Gist, in any event, has not challenged on appeal: that he knew of the "presence," "nature and character," and "identity" of the controlled substance (fentanyl) he sold to Emmanuel. (See CALCRIM No. 2300.)

Gist, however, raises a series of arguments to support his claim there is no substantial evidence to support his conviction on count 1, most notably that the white powdery substance found on Emmanuel was never tested and determined to be a controlled substance. This argument, however, ignores the circumstantial evidence supporting the jury's findings, and the reasonable inferences to be drawn from such evidence, which we have

9

summarized in detail. (See *Navarro, supra*, 12 Cal.5th at p. 302 [in reviewing for sufficiency of the evidence, "[w]e must also accept logical inferences that the jury might have drawn from the circumstantial evidence" (cleaned up)].)

Moreover, the fact the white powdery material found on Emmanuel was not tested did not, as a result, prevent the jury from finding that Gist sold fentanyl. (See, e.g. *People v. Sonleitner* (1986) 183 Cal.App.3d 364, 369 [upholding the defendant's conviction for simple possession of cocaine when officers observed him flushing a white crystalline powder down a toilet, noting the nature of the substance "may be proved by circumstantial evidence" including "by evidence that the substance was a part of a larger quantity which was chemically analyzed . . . , by the expert opinion of the arresting officer . . . , and by the conduct of the defendant indicating consciousness of guilt"].)

The other arguments raised by Gist, including that he did not specifically state in his interview that he sold to Emmanuel, or that Officer Wittlief testified some controlled and noncontrolled substances also may look like fentanyl, were considered and rejected by the jury when it convicted on count 1. These arguments by Gist are simply a request for us to reweigh the evidence and make new credibility determinations favorable to him. This we cannot do in reviewing for sufficiency of the evidence. (See *Navarro, supra*, 12 Cal.5th at p. 302.)

Accordingly, we affirm Gist's conviction on count 1.

*Section 1385, Subdivision (c) Is Inapplicable to Gist's Request to Dismiss His*
*Strike Priors*

Gist next contends the trial court erred when it refused to apply subdivision (c) of section 1385 (§ 1385(c)) in deciding whether to dismiss his two strike priors. As part of his statement in mitigation, Gist argued the court should exercise its discretion and dismiss both priors under either subdivision (a) of section 1385 "in furtherance of justice" (§ 1385(a)) or subd. (c) of this statute, which sets forth nine mitigating factors a court must consider when deciding whether to dismiss "an enhancement" (§ 1385(c)(2)(A–I)).

The trial court refused to apply section 1385(c), ruling that "strike priors are an alternative sentencing scheme, not an enhancement." Instead, it applied section 1385(a) and the principles from *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*); and, after weighing the various factors—including that Gist had six misdemeanor and six felony convictions dating back to 2015, and was on parole when he committed the instant offenses—found it was not "in the furtherance of justice" to dismiss either of Gist's strike priors. We find no error.

A. *Governing Law*

Section 1385(a) authorizes a trial court to dismiss an action "in furtherance of justice." The *Romero* court concluded that section 1385(a) gives a trial court the authority to dismiss prior strike convictions under the Three Strikes law. (*Romero, supra*, 13 Cal.4th at p. 504; accord *People v. Williams* (1998) 17 Cal.4th 148, 158.) Effective January 1, 2019, Senate Bill No. 1393 amended sections 667, subdivision (a), and 1385, subdivision (b) to

11

permit a court to exercise its discretion and dismiss a prior serious felony conviction for purposes of sentencing. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971, citing Stats. 2018, ch. 1013, §§ 1–2.)

The Legislature in Senate Bill No. 81 added section 1385(c) in 2022. (See Stats. 2021, ch. 721, § 1.) It provides in part that a court "shall dismiss *an enhancement* if it is in the furtherance of justice to do so," and requires the court to "consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present." (§ 1385(c), italics added.)

Whether section 1385(c) applies to prior strike convictions is a question of statutory interpretation, which we review de novo. (*People v. Tirado* (2022) 12 Cal.5th 688, 694.)

B.      *Section 1385(c) Applies to Enhancements and Not Strikes*

In *People v. Burke* (2023) 89 Cal.App.5th 237, 243, the Court of Appeal concluded section 1385(c), by its terms, applies when a court is considering an enhancement, and that a sentence under the Three Strikes law is not an enhancement. The *Burke* court noted the "term enhancement has a well-established technical meaning in California law. A sentence enhancement is an additional term of imprisonment added to the base term. It is equally well established that the Three Strikes law is not an enhancement; it is an alternative sentencing scheme for the current offense. We presume the Legislature was aware of, and acquiesced in, both this established judicial definition of enhancement and the distinction between an enhancement and an alternative sentencing scheme such as the Three Strikes law." (*Ibid.* [cleaned up]; accord, *People v. Dowdy* (2024) 107 Cal.App.5th 1, 9 (*Dowdy*) ["It is well established, however, that section 1385, subdivision (c) applies by its terms to a sentence enhancement, but not to a sentence derived from the

12

alternative sentencing scheme of the Three Strikes Law."]; *People v. McDowell* (2024) 99 Cal.App.5th 1147, 1155 [concluding Senate Bill No. 81 did not apply to prior strike convictions, while noting "courts have used the same definition of enhancement—an additional punishment added to the base term—for decades"]; *People v. Olay* (2023) 98 Cal.App.5th 60, 67 (*Olay*) [agreeing with *Burke*'s ultimate conclusion that section 1385(c) "does not apply to the Three Strikes Law" and noting that the legislative history of Senate Bill No. 81 could not have been more clear that "[t]he presumption created by this bill applies to enhancements . . . *but does not encompass alternative penalty schemes*"].)  We find these cases persuasive and likewise conclude section 1385(c) applies to "an enhancement" but not strikes.

Perhaps anticipating this result, Gist argues Assembly Bill No. 600, which amended section 1172.1 effective January 1, 2024, shows the Legislature intended section 1385(c) to apply to strikes.  Assembly Bill No. 600 amended section 1172.1 to allow a trial court, on its own motion, to recall a sentence and resentence a defendant when "applicable sentencing laws at the time of original resentencing are subsequently changed by new statutory authority or case law."  (§ 1172.1, subd. (a)(1), as amended by Stats. 2023, ch. 446, § 2.)  Specifically, Gist relies on an uncodified preamble to amended section 1172.1 for support:  "It is the . . . intent of the Legislature that courts have full discretion in resentencing proceedings pursuant to Section 1172.1 . . . to reconsider past decisions to impose prior strikes.  The list of factors considered in *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, is not exhaustive.  Courts should consider Section 1385 . . . , postconviction factors, or any other evidence that continued incarceration is no longer in the interests of justice."  (Stats. 2023, ch. 446, § 1, para. (b).)

13

We, like other courts that have considered this issue, are "skeptical the Legislature would have expressed an intent to reject the well-established legal meaning of enhancement in such a roundabout manner." (*Olay, supra*, 98 Cal.App.5th at p. 67 [cleaned up]; accord, *Dowdy, supra*, 107 Cal.App.5th at p. 12 ["application of section 1385, subdivision (c) to prior strike convictions would indeed operate in direct conflict with the Three Strikes law," including section 667, subd. (c)(3), which states that the "length of time between the prior serious or violent felony conviction and the current felony conviction *shall not* affect the imposition of sentence," in contrast to section 1385(c)(2)(H), which provides a conviction over five years old is a mitigating factor for dismissing an enhancement]; *People v. Dain* (2024) 99 Cal.App.5th 399, 412 ["We do not believe an uncodified declaration in a subsequent law amending a different statute demonstrates the Legislature intended the term enhancement as used in section 1385(c) to refer to something other than its well-established legal meaning." [(Cleaned up.)]].)

We therefore conclude as a matter of law that the trial court did not err when it applied section 1385(a) and *Romero, supra*, 13 Cal.4th 497—but not section 1385(c)—in refusing to strike Gist's two strike priors.[6]

## III.

### *Remand Is Necessary for an Ability-to-Pay Hearing*

Gist contends the trial court erred by failing to conduct an ability to pay hearing before imposing the restitution fine and the other fees and

---

[6] In light of our decision on the merits, we deem it unnecessary to decide the People's alternate contention that Gist forfeited this issue on appeal by failing to raise it in the trial court.

14

assessments. Since his sentencing, and after the parties submitted their appellate briefs, the Supreme Court decided *Kopp, supra*, 19 Cal.5th 1. The *Kopp* court concluded that a trial court *must* conduct an ability-to-pay hearing before imposing a (1) restitution fine above the statutory minimum of $300 (*id.* at p. 30; § 1202.4, subds. (b)(1), (c), (d)); or (2) $150 drug program fee (*Kopp*, at pp. 12, 30; Health & Saf. Code, § 11372.7, subds. (a), (b)). The Supreme Court also found that, if requested by the defendant, the court must consider the defendant's inability to pay before imposing a court operations assessment (§ 1465.8, subd. (a)(1)) or a court facilities assessment (Gov. Code, § 70373, subd. (a)(1)), "allowing the parties [on remand] to present any relevant evidence or argument on the matter" (*Kopp*, at p. 31).

Here, at Gist's sentencing, the trial court initially imposed a $1,800 restitution fine, which is $1,500 above the statutory minimum (§ 1202.4, subd. (b)(1)), and a matching parole revocation fine, which it stayed (§ 1202.45, subd. (a)). Gist then asked the court to impose "minimum fines and fees based on an ability to pay," citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). *Kopp*, however, has since overruled *Dueñas*. (*Kopp, supra*, 19 Cal. 5th at p. 23, fn. 17 ["Contrary to *Dueñas*'s suggestion, we do not find a due process requirement to hold an ability to pay hearing before imposing every punitive fine."].) Rather than hold an evidentiary hearing on Gist's ability to pay, the court simply agreed to reduce the restitution and matching parole revocation fines "to the minimum of $600 each." It also imposed a $50 criminal laboratory analysis fee (Health & Saf. Code, § 11372.5, subd. (a)); a $150 drug program fee (*id.* § 11372.7, subds. (a), (b)); an $80 court operations assessment (§ 1465.8, subd. (a)(1)); and a $60 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)).

As a result of the *Kopp* decision, we conclude Gist is entitled to a hearing on his ability to pay the $600 restitution fine, which is $300 above the statutory minimum (§ 1202.4, subd. (b)(1)) as well as the $150 drug program fee (Health & Saf. Code, § 11372.7, subds. (a), (b)). (See *Kopp, supra*, 19 Cal.5th at p. 30; § 1202.4, subd. (c) [providing in part that "[i]nability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b) [of this statute"]; Health & Saf. Code, § 11372.7, subd. (b) [the drug program fee under subdivision (a) of this statute may not be imposed "[i]f the court determines that the person does not have the ability to pay" it].)

On remand, Gist also may request that the court consider whether he has the ability to pay the court operations assessment (§1465.8, subd. (a)(1)) and the court facilities assessment (Gov. Code, § 70373, subd. (a)(1)) it previously imposed.[7] In addition, because Gist relied on *Dueñas* and did not invoke the excessive fines clauses, on remand he shall be afforded "the opportunity to assert legal analyses applicable to such a challenge and argue how the particular facts of this case inform such an inquiry." (See *Kopp,*

---

[7] The $50 criminal laboratory analysis fee the court imposed is mandatory. (Health & Saf. Code, § 11372.5, subd. (a); *Kopp, supra*, 19 Cal.5th at p. 30.)

16

*supra*, 19 Cal.5th at p. 23, citing U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.)[8]

DISPOSITION

The matter is reversed and remanded for the limited purpose of allowing the trial court, in accordance with this opinion and *Kopp*, to determine whether Gist has the ability to pay the various fines, fees, and assessments it previously imposed.  In all other respects, the judgment is affirmed.


DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.

---

[8]     In light of our decision on the merits, we deem it unnecessary to reach the People's alternate argument that Gist forfeited his challenge to the fines, fees, and assessments based on his alleged failure to request an ability-to-pay hearing in the trial court.